J-S57025-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN RE: ADOPTION OF D.R., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: M.M., MOTHER | No. 1145 MDA 2019 |

Appeal from the Decree Entered May 14, 2019
In the Court of Common Pleas of the 39th Judicial District
Franklin County Branch
Orphans' Court at No.: 20-ADOPT-2019

BEFORE:  BOWES, STABILE, and MUSMANNO, JJ.

MEMORANDUM BY STABILE, J.:                **FILED NOVEMBER 14, 2019**

Appellant M.M. ("Mother") appeals from decree entered May 14, 2019 in the Court of Common Pleas of the 39th Judicial District, Franklin County Branch ("orphans' court"), terminating involuntarily her parental rights to her minor son, D.R. ("Child"), born in November 2015.[1]  Upon review, we affirm.

We glean the facts and procedural history of this case from the certified record.  On February 23, 2018, the Franklin County Children and Youth Services ("Agency") received a referral concerning Child's living conditions.  N.T. Hearing, 5/14/19 at 7.  Specifically, it was alleged that Child was subjected to "inadequate living conditions in the home in Shippensburg where

---

[1] Father consented to adoption on February 8, 2019.  The orphans' court confirmed his consent and terminated his parental rights on April 9, 2019.  As a result, Father was not a party to, nor did he participate in, the instant proceeding.

he was residing" with Mother. *Id.* Upon investigating the referral, "the Agency found deplorable living conditions. Throughout the home there was trash, old food throughout the rooms, an abundance of cat feces throughout the home and all over the floor and there was overwhelming odors of feces throughout the home." *Id.* At the time, Mother represented to the Agency that she did not live at the home, but merely stayed there "on occasion overnight or on weekends." *Id.* Mother assured the Agency that she would not stay there in the future with Child. *Id.* at 7-8.

Three days later, on February 26, 2018, the Agency received a second referral pertaining to Child's older sister, who was seven years old and shared a different biological father. *Id.* at 8-9. It was alleged that the sister "went to school dirty[,]" "had a foul odor[,]" and "was very tired." *Id.* at 9. The sister reported "that she was staying at the same address" where the Agency told Mother she could not stay. *Id.* The Agency thereafter conducted an unannounced home visit at the Shippensburg residence subject to the first referral and discovered Mother and Child present there. *Id.* The conditions at the residence were the same or similar to the conditions observed on February 23, 2018. *Id.* Consequently, on the same day, the Agency took Child and his sister into care pursuant to an emergency placement petition. *Id.*

On March 8, 2018, Child was adjudicated dependent, with the permanency goal set at reunification, concurrently with adoption.[2] *Id.* Mother was directed to undergo a parental fitness assessment, comply with all recommendations, obtain and maintain housing and financial stability, and maintain consistent visitation with Child. *Id.* at 10. Mother completed the parental fitness assessment in April 2018 at Alternative Behavior Consultant ("ABC") in Chambersburg. *Id.* The parental fitness assessment resulted in additional recommendations, namely "outpatient mental health counseling for anger management to develop coping strategies."[3] *Id.* at 10-11. Mother also was referred "to community supports as if possible for positive support. She needed consistent hands-on parenting." *Id.* at 11. Mother, however, did not participate in mental health counseling. *Id.*

Mother relayed to the Agency that she could not seek counseling because she "did not have the required insurance." *Id.* at 12. In response, the Agency contacted the counseling provider and informed Mother of the steps she could take for the provider to accept her insurance. *Id.* Mother did not follow up. *Id.* at 13-14. Thus, Mother did not begin counseling as directed and did not provide any information as to why she was unable to attend counseling. *Id.* at 13.

---

[2] Although the sister also was taken into care and adjudicated dependent, she later was placed in her father's custody. N.T. Hearing, 5/14/19, at 10.

[3] The record reveals that Mother has a "9 or 13 year old brain" and has "an intellectual or developmental disability." ABC Assessment and Treatment Report and Recommendations, 5/25/18 at 2, 7.

Mother's cooperation with the Agency varied. *Id.* at 15. For approximately one month in June 2018, the Agency was unable to contact Mother because her phone purportedly was disconnected. *Id.* at 15, 23.

Mother initially lived with her father ("Grandfather"), where the two were in the process of renovating a mobile home for Mother and Child to live in. *Id.* at 18. However, on March 2, 2018, four days after Child was removed from Mother's custody, Grandfather stopped permitting Mother to live in his home and told the Agency that he did so because of Mother's failure to make responsible choices and contribute to the household. *Id.* at 19. Specifically, Grandfather objected to Mother's "being out late, not visiting her children, not contacting her children." *Id.* Mother then lived with friends in their basement. *Id.* She indicated to the Agency that the living space was not suitable for Child. *Id.* at 19, 36. Mother later moved into a mobile home on another friend's property. *Id.* at 36-37.

With respect to financial stability, Mother was seeking employment in addition to receiving social security income. *Id.* at 20. In the spring of 2018, Mother "was fired from her fourth job in three months." *Id.* "She was banned from Axiom Staffing for two years and Randstad for one year." *Id.* Mother explained to the Agency that the terminations were because she had been sick or could not get a ride to work. *Id.* at 21. A friend of Mother's, however, told the Agency that Mother occasionally pretended to be sick. *Id.*

On October 31, 2018, Mother was incarcerated in Cumberland County on charges of rape, statutory sexual assault, involuntary deviate sexual

intercourse, aggravated indecent assault, corruption of minors, solicitation of child pornography, and simple assault.[4] *Id.* at 16. The alleged victim was a thirteen-year-old child of a family friend. *Id.* at 62. Cumberland County Children and Youth relayed to the Agency that it had marked Mother as an indicated perpetrator of child abuse in light of the criminal charges. *Id.* at 16.

Prior to her incarceration, Mother was offered weekly visits with Child through ABC. *Id.* at 21. Mother, however, did not maintain consistent visitation. *Id.* According to the Agency, Mother "only attended three out of the six visits at ABC. And in June of 2018 she was discharged from ABC due to her four no-shows for visits." *Id.* at 21-22. Following the discharge, Mother was offered biweekly visits through the Agency and the foster care provider. *Id.* at 22. Mother, however, attended only one visit on August 1, 2018. *Id.* at 23. The August 1, 2018 visit was Mother's first visit with Child in "several weeks." *Id.* Mother's explanations for failing to visit Child in the preceding weeks involved issues with phone, transportation, and her attempts at finding housing. *Id.* at 23-24. In September 2018, the Agency referred Mother back to ABC, where she attended three visits, the last one occurring on October 29, 2018, two days prior to her incarceration. *Id.* at 24. In total, Mother had six visits with Child from the time Child was removed from Mother's custody until Mother was imprisoned. *Id.* at 25-26. In describing Mother's visits with Child, the Agency noted:

_____

[4] The criminal charges are currently pending.

- 5 -

> The visits that she has had with [Child] were all very positive. There were some issues of how she would have to be redirected, engage with him, but nothing that stood out that was a threat at all to him at the time. [T]he biggest thing was her not working the full program to really assess her skills as a parent.

*Id.* at 45. It also was noted that Mother "does really well with one-on-one engagements with her children during the visits but she struggles with redirection and she becomes easily frustrated and angry." *Id.* at 26. The visits were "supervised visitation." *Id.* at 45.

Additionally, Mother never participated in intensive hands-on parenting services. *Id.* at 26. Had Mother maintained consistent visits through ABC, she would have been able to participate in the hands-on service through ABC. *Id.* at 27. With the exception of the parental fitness assessment, Mother still needs to complete all remaining recommended services, including mental health counseling, and family group decision-making. *Id.* at 27-28.

While incarcerated, Mother requested visits with Child. *Id.* at 24. Cumberland County Prison, however, could not facilitate visits between Mother and Child because Child was not in placement with Cumberland County Children and Youth Services. *Id.* at 25. If it were not for Cumberland County Prison's refusal, the Agency would have provided and facilitated visitation between Mother and Child. *Id.* In the absence of visitation, Mother corresponded with Child through letters, cards, and things of that nature while incarcerated. *Id.* In particular, "she wrote him a card about how much she misses him. She loves him." *Id.* at 43. The Agency was able to pass along the card to the foster family. *Id.* In response, Child "drew a picture for

[Mother]." The Agency also "was able to pass it onto the prison." **Id.** Mother, however, did not have "too many" correspondences with Child since her incarceration. "[I]nitially there was no correspondence at all. There were some letters being passed back and forth[.]"[5] **Id.**

While incarcerated, Mother has not sought the Agency's assistance in obtaining counseling or mental health services. **Id.** at 37-38. Mother's conversations with the Agency were limited to, *inter alia*, asking how Child was doing and receiving updates on Child. **Id.** at 38.

The Agency relayed that it did not have "any assurance that Mother would cooperate with the services necessary to the extent to achieve reunification within a reasonable amount time," should Mother's parental rights remain intact. **Id.** at 28. The Agency further noted that Child has a strong bond and attachment with his sister whom he contacts weekly either through phone calls, church events or visitations. **Id.** The Agency has encouraged that this relationship between the siblings continues. **Id.** at 29.

On April 30, 2019, the Agency filed a petition to terminate Mother's parental rights to Child involuntarily. The orphans' court conducted a hearing on May 14, 2019,[6] at which the Agency offered the testimony of Milton

---

[5] The record is unclear as to how frequently Mother corresponded with Child or whether Mother communicated or attempted to communicate with Child telephonically while incarcerated.

[6] At the hearing, it was noted that Child had been in placement for over fourteen months. **Id.** at 27. Attorney Kristen B. Hamilton represented Child as both his guardian *ad litem* ("GAL") and his legal counsel.

Webber, previously employed as a caseworker at the Agency. Among other things, Mr. Webber described Child's relationship with his current foster family:

> Very close and very comfortable with them. I have heard him call foster mother, Mom or Mother. The same with foster dad, Dad. He seems to get along with their children. I can see there's a great attachment that he has towards them even from the first time that he has interacted until now. He seems to really have grown fondly of that family.

*Id.* at 32-33. The foster home is a permanency resource. *Id.* at 33. Furthermore, Child's maternal grandmother ("Grandmother") also is a permanency resource. *Id.* Child has a "very positive relationship" with Grandmother and the two interact as grandparent and child. *Id.* at 31-32. The GAL supported the position that termination of Mother's parental rights was in Child's best interest. *Id.* at 58-60. At the conclusion of the hearing, the orphans' court terminated Mother's parental rights and awarded custody of Child to the Agency. *Id.* at 65-66. Mother timely appealed. Both the orphans' court and Mother complied with Pa.R.A.P. 1925.

On appeal, Mother raises two issues for our review:

[I.] Was there clear and convincing evidence presented at trial to establish that Mother's parental rights should have been terminated due to her failing to perform parental duties or due to incapacity, abuse, neglect or refusal on her part that cannot or will not be remedied by her within a reasonable time?

[II.] Was there clear and convincing evidence to determine that [Child] will not be harmed by the severing of the bond with Mother and that termination serves his needs and welfare?

Mother's Brief at 6.

We review Mother's claims in accordance with the following standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the [orphans'] court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the [orphans'] court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The [orphans'] court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to [orphans'] courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S.A. § 2511. It requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Mother's parental rights to Child pursuant to subsection 2511(a)(1), (2), (5), (8), and (b). We need only agree with the court as to any one subsection of 2511(a), as well as subsection 2511(b), to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en

- 9 -

*banc*), ***appeal denied***, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision only pursuant to subsections 2511(a)(2) and (b), which provide as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We begin by assessing whether the orphans' court committed an abuse of discretion by terminating Mother's rights to Child pursuant to subsection 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the

causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted). As we recently explained in *In re Adoption of K.M.G.*, 2019 PA Super 281, ___ A.3d ___, 2019 WL 4392506 (Pa. Super. filed Sept. 13, 2019) (*en banc*):

> The grounds for termination under Section 2511(a)(2) are not limited to a parent's affirmative misconduct, but rather a parental incapacity that a parent cannot remedy. Parents have an "affirmative duty" to work towards the return of their children. This "affirmative duty," at a minimum, requires a parent to cooperate with the Child and Youth Agencies and complete the rehabilitative services necessary so that the parent can perform his parental duties and responsibilities.

> Additionally, the statute **does not provide a parent with an unlimited period [of] time to overcome the incapacity that led to the adjudication of the child; rather, a parent must make a diligent effort towards overcoming the incapacity so that the parent can assume his parental duties within a reasonable period of time after the adjudication of dependency**.

> This Court has explained, Section 2511(a)(2) does not focus on a parent's refusal or failure to perform parental duties, but instead emphasizes **the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being**. Therefore, when addressing the requirements of Subsection (a)(2), the orphans' court should not ignore a child's need for a stable home and strong, continuous parental ties. This factor is particularly important when the disruption of the family has already occurred and there is no reasonable prospect for reuniting it.

**K.M.G.**, 2019 WL 4392506 at * 6-7 (quotation marks, citations and brackets omitted) (emphasis added).

Furthermore, "a parent's incarceration is relevant to the Section 2511(a)(2) analysis and, depending on the circumstances of the case, it may be dispositive of a parent's ability to provide the 'essential parental care, control or subsistence' that the section contemplates." **In re A.D.**, 93 A.3d 888, 897 (Pa. Super. 2014) (discussing **In re Adoption of S.P.**, 47 A.3d 817 (Pa. 2012)). Indeed, our Supreme Court has held that "incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing essential parental care, control, or subsistence." **S.P.**, 47 A.3d at 830 (citation and internal quotation marks omitted). Notably, "the length of the remaining confinement can be considered as highly relevant to whether the conditions and causes of the incapacity . . . cannot or will not be remedied by the parent, sufficient to provide grounds for termination pursuant to [Section] 2511(a)(2)." **Id.** (internal quotation marks omitted).

Also relevant are the efforts the parent made to care for a child before the parent was incarcerated as an indication of the efforts the parent will make when the parent is no longer incarcerated. **See In re Z.P.,** 994 A.2d 1108, 1126 (Pa. Super. 2010) (terminating parental rights of incarcerated father after examining his parenting history before incarceration and finding "Father's overall parenting history revealed no genuine capacity to undertake his parental responsibilities"); **In re E.A.P.**, 944 A.2d 79, 83 (Pa. Super.

2008) (terminating parental rights of incarcerated mother after examining her pre-incarcerated parenting and determining that her repeated incarcerations indicated she did not have the capacity to parent).

Another factor to consider is the parent's effort to maintain a relationship with a child while incarcerated. *See E.A.P.*, 944 A.2d at 83. However, this factor is not determinative because the orphans' court may place weight on other factors even when the parent is doing what she is supposed to do while incarcerated:

> Each case of an incarcerated parent facing termination must be analyzed on its own facts, keeping in mind, with respect to subsection (a)(2), that the child's need for consistent parental care and stability cannot be put aside or put on hold simply because the parent is doing what she is supposed to do in prison.

*Id.* at 84. In other words, the orphans' court must consider "[t]he complete circumstances" of the case. *Z.P.*, 994 A.2d at 1125.

Here, Mother asserts, *inter alia*, that the orphans' court abused its discretion in terminating her parental rights involuntarily under Section 2511(a)(2) because the evidence was insufficient to find that "any conditions that prevented Mother from being able to care for her son cannot and will not be remedied by Mother." Mother's Brief at 13. Mother further asserts that "[g]iven additional time, Mother would be eligible for mental health treatment and this would help her make significant progress in obtaining employment and housing." *Id.* at 13-14.

Based on our thorough review of the record, as detailed above, we are constrained to disagree with Mother's assertions. The evidence reveals that

Child was removed from Mother's custody because of deplorable living conditions. To facilitate reunification, the Agency directed Mother to undergo a parental fitness assessment, comply with recommendations, obtain and maintain housing and financial stability and maintain consistent visitation with Child. Mother, however, complied fully only with the requirement to obtain a parental fitness assessment, which resulted in additional recommendations for mental health counseling. Mother did not obtain mental health services. To the extent Mother had issues with insurance coverage relating to mental health counseling, the Agency made reasonable efforts to assist her in overcoming the issues. Mother failed to follow up, resulting in her failure to obtain counseling.

With respect to visitation, it was anything but consistent. Mother visited with Child only six times in an eight-month period, spanning from Child's removal on February 26, 2018 from Mother's care until her incarceration on October 31, 2018. Additionally, Mother did not have stable housing. After being ejected from Grandfather's home for failing to make responsible life choices and contributing to the household, she lived with friends in their basement or in a mobile home. When living in a friend's basement, Mother told the Agency that the living space was not suitable for Child.

Moreover, Mother did not have stable employment. Although she was receiving social security income, Mother was fired from four jobs over the course of three months in the spring of 2018. In fact, two staffing companies banned her for one and two years, respectively. Mother blamed her

terminations on illness or transportation issues, but one of her friends informed the Agency that Mother occasionally would pretend to be sick.

Lastly, prior to her incarceration, Mother did not fully cooperate with the Agency. The record indicates that Mother did not have any contact with the Agency during the month of June 2018 because her cell phone purportedly was disconnected.

The record also indicates that Mother currently is incarcerated in Cumberland County prison on various charges relating to sexual abuse of a thirteen-year-old girl who was the daughter of a family friend. At the time of the termination hearing, Mother had not been convicted and was awaiting trial.

While incarcerated, Mother made minimal efforts to remain in contact with Child. Even though there was no communication initially, Mother later sent some cards and letters to Child. At Cumberland County prison, Mother could not visit with Child because he was not in the custody of Cumberland County Children and Youth Services. Finally, while incarcerated, Mother has failed to seek the Agency's assistance in obtaining the required services, such as mental health counseling.

As the orphans' court summarized:

[Child] was initially taken into the care of the Agency based on Mother's inability to provide suitable housing. Mother subsequently refused to complete the objectives required for reunification with [Child]. In short, her failure to take the necessary steps to secure counseling, housing, or employment, along with her failure to consistently visit [Child], has caused him to be without essential parental care for at least fourteen months. [The orphans' court] is further convinced by Mother's criminal

- 15 -

charges and demonstrated lack of commitment to stability that Mother cannot or will not remedy these conditions.

Orphans' Court Opinion, 7/11/19, at 13.

Given the foregoing, we agree with the orphans' court that Mother failed to make reasonable and diligent efforts at reunification prior to her incarceration. Put differently, Mother made little progress on her reunification objectives before her imprisonment. Currently, Mother is facing serious criminal charges that could subject her to a considerable term of incarceration. Although we do not opine on the merit, if any, of the underlying charges, it is unclear whether Mother would be in a position to care for Child, even if those charges are dismissed. Thus, as the evidence of record reveals, Mother's repeated and continued incapacity or refusal has caused Child to be without essential parental care for the entire life of the case, since February 26, 2018, and Mother has failed to meet the goals necessary to remediate the causes of her incapacity or refusal.[7] ***See Adoption of J.J.***, 515 A.2d 883, 891 (Pa. 1986) ("[A] parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.").

To the extent Mother now asserts that, if given additional time, she would obtain mental health services, such assertion is seemingly untimely and disingenuous. ***See A.L.D.***, 797 A.2d at 340 ("[A] parent's vow to cooperate,

---

[7] Termination of parental rights under Section 2511(a)(2) may be predicted upon either incapacity or refusal to perform parental duties. ***A.L.D.***, 797 A.2d at 337.

- 16 -

after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous.").

We consider next whether the orphans' court abused its discretion by terminating Mother's rights pursuant to subsection 2511(b). We adhere to the following analysis.

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the [orphans'] court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the [orphans'] court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted). Furthermore, our Supreme Court has explained that "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 71 A.3d at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.*

at 269. The **T.S.M.** Court observed that "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." **Id.**

Here, Mother claims that terminating her parental rights would be contrary to Child's needs and welfare because she and Child share a bond and because severing that bond also would "permanently terminate[] his legal relationship with his sister, to whom he is close." Mother's Brief at 16. Mother also claims that Child "is not old enough to understand the concept of adoption. He will not be harmed by giving Mother additional time because he does not have any concept of the difference between when he is in a foster placement in his home and when he has been adopted by his foster home." **Id.**

Instantly, it is clear that the orphans' court considered Child's bond with Mother when reaching its decision, as our case law requires. However, the mere existence of a bond does not preclude the termination of parental rights. **N.A.M.**, 33 A.3d at 103. As stated above, a court may place equal or greater weight on the many other factors that could be relevant to a child's needs and welfare, including the child's need for permanence and stability, as well as his or her relationship with pre-adoptive foster parents. **C.D.R.**, 111 A.3d at 1219.

In this case, as discussed during our analysis of subsection 2511(a)(2), the record demonstrates that Child is in dire need of permanence and stability,

which Mother cannot provide. ***See id.*** at 1220 ("Clearly, it would not be in Child's best interest for his life to remain on hold indefinitely in hopes that Mother will one day be able to act as his parent."). In addition, Child has a strong and positive relationship with his pre-adoptive foster parents, who have been consistent caregivers in his life for almost half of his life. ***See Matter of Adoption of M.A.B.***, 166 A.3d 434, 449 (Pa. Super. 2017) ("[A] child develops a meaningful bond with a caretaker when the caretaker provides stability, safety, and security regularly and consistently to the child over an extended period of time.").

> The orphans' court reasoned:
>
> Based on the record, the [c]ourt found that, while Mother may share a bond with [Child], she failed to address his developmental, physical, and emotional needs and welfare while he was in her care. Specifically, Mother was unable to provide [Child] with a healthy and safe living environment. She thereafter failed to demonstrate commitment to rectifying the situation and lost the assistance of her father based on her irresponsible personal choices. Further relevant to [Child's] safety and welfare is Mother's deeply concerning status as an indicated perpetrator of child abuse.
>
> The [c]ourt moreover found that [Child's] needs are presently met by his foster parents, with whom [Child] has developed a parent-child bond. [Child's] foster family and [Grandmother] are presently permanency recourses; accordingly, [the court] concluded that delaying permanency for [Child] so that Mother may address her numerous issues is not in [Child's] best interest.

Orphans' Court Opinion, 7/11/19, at 15-16. Specifically, Child refers to his foster parents as "mom" and "dad." Lastly, Mother's argument that termination of her parental rights also would extinguish Child's relationship with his sister is belied by the record. As noted earlier, the Agency has

encouraged the continuation of Child's relationship with his sister. Accordingly, we conclude that the evidence of record demonstrates that terminating Mother's parental rights will best serve Child's developmental, physical, and emotional needs and welfare under Section 2511(b).

In sum, in light of the foregoing, we conclude that the orphans' court did not abuse its discretion by terminating Mother's parental rights to Child involuntarily. We therefore affirm the orphans' court's May 14, 2019 decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/14/2019